FRANK N. DARRAS #128904, Frank@DarrasLaw.com
SUSAN B. GRABARSKY #203004, SGrabarsky@DarrasLaw.com
PHILLIP S. BATHER #273236, PBather@DarrasLaw.com

DarrasLaw

3257 East Guasti Road, Suite 300
Ontario, California 91761-1227
Telephone: (909) 390-3770
Facsimile: (909) 974-2121

Attorneys for Plaintiff
ADRIENNE GAVURA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| ADRIENNE GAVURA, | Case No: |
| --- | --- |
| Plaintiff, | COMPLAINT FOR BENEFITS UNDER AN EMPLOYEE WELFARE BENEFIT PLAN |
| vs. | |
| AETNA LIFE INSURANCE COMPANY; HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY; and, BANK OF AMERICA CORPORATION LONG TERM DISABILITY PLAN, | |
| Defendants. | |

Plaintiff alleges as follows:

1. This Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1337 and 29 U.S.C. § 1132(a), (e), (f), and (g), of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101, *et seq.* (hereafter "ERISA") as it involves a claim by Plaintiff for Disability benefits under an employee benefit plan regulated and governed under ERISA. Jurisdiction is predicated under these code sections as well as 28 U.S.C. § 1331 as this action involves a federal question.

2. The ERISA statute at 29 U.S.C. § 1133, in accordance with Regulations of

the Secretary of Labor, provides a mechanism for internal appeal of benefit denials. Those avenues of appeal have been exhausted.

3. Plaintiff is informed and believes and thereon alleges that the BANK OF AMERICA GROUP LONG TERM DISABILITY BENEFITS PLAN ("Bank of America" or the "Plan") is an employee welfare benefit plan established and maintained by Bank of America to provide its employees and those of its subsidiaries and affiliates, including Plaintiff, ADRIENNE GAVURA ("Plaintiff" and/or "Ms. Gavura"), with income protection in the event of a disability and is the Plan Administrator.

4. Plaintiff alleges upon information and belief that Defendant, AETNA LIFE INSURANCE COMPANY ("AETNA"), is and at all relevant times was, a corporation duly organized and existing under and by virtue of the laws of the State of Connecticut, authorized to transact and transacting the business of insurance in this state, and, the insurer and Claims Administrator for the Plan.

5. Plaintiff alleges upon information and belief that Defendant, THE HARTFORD LIFE INSURANCE COMPANY. ("HARTFORD"), is and at all relevant times was, a corporation duly organized and existing under and by virtue of the laws of the State of California, authorized to transact and transacting the business of insurance in this state, and the insurer and Claims Administrator for the Plan. Defendant HARTFORD acquired Defendant AETNA's group disability business in or about 2017 and has subsequently administered and funded Plaintiff's claim for Long Term Disability benefits.

6. Plaintiff further alleges that venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) in that Defendant HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY ("HARTFORD"), who fully insured the insurance policies at issue, and who is ultimately liable if Plaintiff is found disabled, may be found in this district. Since on or about July 10, 1973, HARTFORD has been registered as a corporation with the State of California, has extensive contacts within the state, employs California residents, conducts ongoing business within the state and, therefore, may be found within this state.

7. At all relevant times Plaintiff was a resident and citizen of California, an employee of Bank of America, its successors, affiliates and/or subsidiaries, and a participant in the Plan.

8. Based upon information and belief, Plaintiff alleges that at all relevant times herein, Plaintiff was covered under group disability policy number GP-811383 (the "Policy") that had been issued by Defendant HARTFORD to Bank of America to insure its Plan, and the eligible participants and beneficiaries of the Plan, including Plaintiff.

9. The subject Policy promised to pay Plaintiff monthly long term disability benefits for a specified period of time should she become disabled. Therefore, Defendant HARTFORD both funds and decides whether claimants will receive benefits under the Plan and, as such, suffers from a structural conflict of interest which requires additional skepticism upon review.

10. Based upon information and belief, Plaintiff alleges that, according to the terms of the Plan, if Plaintiff became disabled, Defendant HARTFORD promised to pay long term disability benefits to Plaintiff as follows:

- "Disabled" or "Disability" is defined as:
  - For the first 18 months of disability: you are unable to perform the material duties of your own occupation solely because of an illness, injury, or disabling pregnancy-related condition.
  - After the first 18 months of disability: you are unable to perform the material duties of any occupation solely because of an illness, injury, or disabling pregnancy-related condition.
- Own Occupation: The occupation that you are routinely performing when your period of disability began.
- You will no longer be considered as disabled and eligible for long-term monthly benefits after benefits have been payable for 24 months if it is determined that your disability is primarily caused by:

- A mental health or psychiatric condition, including physical manifestations of these conditions, but excluding conditions with demonstrable, structural brain damage; or
- Alcohol and/or drug abuse.

11. Plaintiff was an employee of Bank of America since August 20, 1979. Prior to her disability, Plaintiff was working as a Business Control Manager for Bank of America.

12. It is undisputed that on May 3, 2013, Plaintiff became disabled under the terms of the Plan. Defendant HARTFORD approved her claim and paid disability benefits beginning November 1, 2013.

13. On or about November 1, 2015, Defendant determined Ms. Gavura remained disabled 24 months later due to physical and exertional limitations imposed by her degenerative disc disease of the cervical and lumbar spine, status post-cervical and lumbar fusions, and impingement syndrome and rotator cuff tear of the right shoulder.

14. On or about September 13, 2016, Stephan Yacoubian, M.D., an Orthopedic Surgeon who has treated Plaintiff since 2015, performed an arthroscopic labral debridement, subacromial decompression, extensive synovectomy and lysis of adhesions, removal of a 5-6mm debris fragment, and peripheral nerve block of her right shoulder. Plaintiff's pre-and-post-operative diagnoses were "Right shoulder labral re-tear and loose fragmentation, and subacromial bursitis with adhesions."

15. On or about October 20, 2016, Yuri Falkinstein, M.D., an Orthopedic Surgeon who has treated Plaintiff since 2015, performed an anterior cervical discectomy and fusion at her C5-C6 spinal level. Plaintiff's pre-and-post operative diagnoses were "C5-6 degenerative disc disease and bulging disc and stenosis."

16. On or about April 13, 2017, Dr. Falkinstein performed a left-sided microdiscectomy at Plaintiff's L4-L5 spinal level. Plaintiff's pre-and-post-operative diagnoses were "L4-5 herniated disc."

17. On or about September 22, 2018, Plaintiff underwent an MRI examination of her lumbar spine. The examination revealed moderately decreased disc height, a 4mm posterior disc bulge, a left laminectomy defect, and possible impingement of the L5 nerve root at the L4-L5 spinal level.

18. On or about December 26, 2018, Dr. Falkinstein performed a transforaminal interbody fusion, and bilateral laminotomy and decompression at Plaintiff's L4-L5 spinal region. Plaintiff's pre-and-post-operative diagnoses were, "L4-5 degenerative disc disease and stenosis."

19. On or about October 15, 2019, Richard Kroop, M.D., a specialist in Internal Medicine, completed an Attending Physician Statement after evaluating Ms. Gavura's condition. Plaintiff's diagnoses were noted to include degenerative disc disease and radiculopathy of the cervical and lumbar spine, which rendered her unable to lift or carry any significant amount of weight. Ms. Gavura was also noted to be unable to perform any bending, pulling, pushing, climbing, crawling, kneeling, or twisting at this time.

20. On or about December 4, 2019, Chrystina Jeter, M.D., a specialist in Pain Medicine and Anesthesiology, administered an epidural steroid injection to Plaintiff's C7-T1 spinal region. Plaintiff's pre-and-post-operative diagnoses were "Cervical radiculopathy."

21. On or about March 11, 2020, Dr. Jeter administered right medial branch nerve blocks at Plaintiff's C4-C5, C5-C6, and C6-C7 spinal regions. Ms. Gavura's pre-and-post-operative diagnoses were "Cervical spondylosis."

22. On or about April 7, 2020, Dr. Jeter outlined Plaintiff's functional capacity in a Capabilities and Limitations Worksheet. The doctor indicated that Ms. Gavura would not be able to perform any significant climbing, crawling, kneeling, lifting, pulling, pushing, reaching above her shoulder, forward reaching, carrying, bending or twisting. Plaintiff would be limited to occasional hand grasping, fine/gross manipulations,

repetitive motions, sitting, and stooping. Dr. Jeter concluded by opining it is unlikely that Ms. Gavura would be able to return to work in any capacity.

23. On or about April 30, 2020, Plaintiff underwent an x-ray examination of her right shoulder at Orthopaedic Surgery Specialists. The examination revealed moderate degenerative joint disease in her right shoulder.

24. On or about May 13, 2020, Dr. Jeter administered another epidural steroid injection at Plaintiff's C7-T1 spinal region. Ms. Gavura's pre-and-post-operative diagnoses at this encounter were, "Cervical radiculopathy."

25. On or about July 13, 2020, Dr. Falkinstein reviewed a letter dated November 5, 2019, wherein he allegedly indicated Plaintiff was capable sitting, standing, and walking long enough to perform a standard 40 hour work week with the ability to lift and carry up to 20 lbs. The doctor stated that he strongly believed this letter to have been filled out in error. Dr. Falkinstein went on to say that Ms. Gavura had the same symptoms now as she did then, which include severe neck pain and spasm, difficulty with concentration, and prolonged sitting or bending. Plaintiff was also said to be limited to: no sitting for more than 30 minutes, no repetitive neck movements, avoiding static neck positions, and taking 10 minute breaks every 30 minutes from typing and sitting to treat her symptoms.

26. On or about July 17, 2020, Plaintiff's right shoulder underwent an MRI examination at ProHealth Advanced Imaging. The MRI revealed persistent residual or recurrent tearing of the superior anterior labrum, indicative of a torn right rotator cuff.

27. On or about July 23, 2020, Dr. Jeter responded to correspondence from HARTFORD regarding Plaintiff's ability to perform Sedentary Work. The doctor stated that her patient would not be able to perform this level of work primarily due to her limited range of cervical motion. This limitation, including flexion and extension, would make it difficult for Ms. Gavura to perform any significant lifting, carrying, pushing or pulling. Dr. Jeter also indicated that Plaintiff's cervical radiculopathy was also causing

constant numbness, tingling, and weakness, which would also interfere with her ability to perform Sedentary Work.

28. On or about July 29, 2020, Plaintiff underwent a Functional Capacity Evaluation performed by Ramone De Los Reyes, D.P.T. In his examination and testing of Ms. Gavura, Dr. De Los Reyes determined that she was limited to only occasional sitting, static standing, walking, bending at the waist, squatting, twisting, power and simple grasping, fingering and reaching overhead or forward.

29. On or about August 6, 2020, Dr. Kroop responded to correspondence from HARTFORD regarding Plaintiff's ability to perform Sedentary Work. The doctor indicated that his patient would not be able to perform that type of work due to the level of pain in her neck, low back, and bilateral shoulders, along with her headaches, and muscle spasms from her occipital to her shoulders.

30. On or about September 8, 2020, Dr. Yacoubian performed arthroscopic subacromial decompression, 9mm resection of the distal clavicle, debridement of partial rotator cuff tear, debridement of partial labral tear, debridement of chondromalacic areas of the glenohumeral joint, and synovectomy and lysis of adhesions of Plaintiff's right shoulder. Ms. Gavura's pre-operative diagnosis was, "Right shoulder subacromial impingement syndrome, AC joint osteoarthritis, partial rotator cuff tear and partial labral tear. Her post-operative diagnosis was the same, with the addition of "plus adhesions and synovitis from prior surgery."

31. On or about January 14, 2021, Dr. Jeter responded to additional correspondence from HARTFORD regarding Plaintiff's ability to perform Sedentary Work. The doctor indicated that she agreed with the findings from Dr. De Los Reyes, her previous limitations were still present, and Ms. Gavura was still unable to perform Sedentary Work.

32. Notwithstanding all of the evidence of her continuing disability, HARTFORD unreasonably and unlawfully denied Ms. Gavura's claim on February 18, 2020. In correspondence March 26, 2021, HARTFORD maintained its unreasonable

and unlawful denial of benefits from February 9, 2020, through September 7, 2020, and November 9, 2020, to the present.

33. In the determination letter dated March 26, 2021, Defendant HARTFORD acknowledged that further investigation was needed to determine if Plaintiff was under a disability for the period of September 8, 2020, through November 8, 2020, when she underwent her right shoulder surgery and subsequent recovery. Subsequently, HARTFORD paid benefits to Plaintiff for the period of September 8, 2020 through November 8, 2020.

34. According to HARTFORD's denial letters:

- **February 18, 2020:** "We are unable to continue your monthly benefits beyond February 18, 2020, because you are able to perform any reasonable occupation. […] If this disability claim has been denied in whole or in part, or if you feel your claim should be certified for a longer period, you can ask us to look at it again."

- **March 26, 2021:** "…your client did not continue to meet the definition of being disabled of any reasonable occupation as of February 19, 2020 through September 7, 2020, and from November 9, 2020, to present. …we are returning your client's claim for further investigation to the claims team to see if your client would meet all policy provisions for an overturn of LTD benefits from September 8, 2020, through November 8, 2020. […] Since we have made our final decision no other action will be taken by us. […] If you don't agree with the final appeal decision, you can file a lawsuit under section 502(a) of a law called ERISA."

35. In so doing, Defendant HARTFORD unreasonably and unlawfully relied upon the opinions of physicians who were financially biased and/or not qualified to refute the findings of Plaintiff's board certified physicians; relied strictly upon physical requirements of occupations instead of taking into consideration the non-exertional

requirements of Plaintiff's regular, or any other, occupation; and misrepresented the terms of the Policy.

36. Additionally, Defendant HARTFORD knew, or should have known, that the documentation submitted to and/or obtained by Defendant clearly substantiated Plaintiff's disability and entitled her to benefits under the Plan.

37. To date, even though Plaintiff has remained disabled, Defendant HARTFORD has not paid Plaintiff any disability benefits under the Policy from February 19, 2020 through September 8, 2020, and from November 9, 2020 forward. The unlawful nature of HARTFORD's denial decision is evidenced by, but not limited to, the following: HARTFORD engaged in procedural violations of its statutory obligations under ERISA; and HARTFORD ignored the opinions of Plaintiff's board certified treating physicians and/or misrepresented the opinions of Plaintiff's treating physicians. Deference should be given to the treating physicians' opinions as there are no specific, legitimate reasons for rejecting the treating physicians' opinions which are based on substantial evidence in the claim file. Further, HARTFORD's highly conflicted physicians' opinions do not serve as substantial evidence as they are not supported by evidence in the claim file nor are they consistent with the overall evidence in the claim file.

38. For all the reasons set forth above, the decision to deny disability insurance benefits was wrongful, unreasonable, irrational, sorely contrary to the evidence, contrary to the terms of the Plan, and contrary to law. Further, HARTFORD's denial decision and actions heighten the level of skepticism with which a court views a conflicted administrator's decision under *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955 (9th Cir. 2006) and *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2342 (2008).

39. Additionally, ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon a plan administrator, namely, that the administrator discharge its duties in respect to discretionary claims processing

solely in the interests of the participants and beneficiaries of the plan, 29 U.S. Code §1104(a)(1); it simultaneously underscores the particular importance of accurate claims processing by insisting that administrators provide a full and fair review of claim denials, 29 U.S. Code §1133(2); and it supplements marketplace and regulatory controls with judicial review of individual claim denials, 29 U.S. Code §1132(a)(1)(B).

40. As a direct and proximate result of HARTFORD's failure to provide Plaintiff with disability benefits, Plaintiff has been deprived of said disability benefits from February 19, 2020 through September 8, 2020, and from November 9, 2020 though the present.

41. As a further direct and proximate result of the denial of benefits, Plaintiff has incurred attorney fees and costs to pursue this action, and is entitled to have such fees and costs paid by defendants pursuant to 29 U.S.C. §1132(g)(1), ERISA § 502(g)(1).

42. A controversy now exists between the parties as to whether Plaintiff was disabled as defined in the Plan. Plaintiff seeks the declaration of this Court that she met the Plan's definition of disability and consequently is entitled to all benefits from the Plan to which she might be entitled while receiving disability benefits, with reimbursement of all expenses and premiums paid for such benefits from the beginning of her claim. In the alternative, Plaintiff seeks a remand for a determination of Plaintiff's claim consistent with the terms of the Plan.

WHEREFORE, Plaintiff prays for relief against Defendant as follows:

1. An award of benefits in the amount not paid Plaintiff beginning on or about February 19, 2020 through September 8, 2020 and from November 9, 2020 to the present, together with interest at the legal rate on each monthly payment from the date it became due until the date it is paid; plus all other benefits from the Plan to which she might be entitled while receiving disability benefits, with reimbursement of all expenses and premiums paid for such benefits or, in the alternative, a remand for a determination of Plaintiff's claim consistent with the terms of the Plan;

2. An order determining Plaintiff is entitled to disability payments/benefits so long as she remained disabled as defined in the Plan;

3. For reasonable attorney fees and costs incurred in this action; and,

4. For such other and further relief as the Court deems just and proper.

Dated: October 21, 2021

**DarrasLaw**

_____
FRANK N. DARRAS
SUSAN B. GRABARSKY
Attorneys for Plaintiff
ADRIENNE GAVURA